FILED

RICHARD I. FINE
Prisoner ID # 1824367
c/o Men's Central Jail
441 Bauchet Street
Los Angeles, CA 90012

2010 JAN -5 PM 1:47

CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

# CV10-00048 JFW(CW)

RICHARD I. FINE,

Plaintiff,

vs.

STATE BAR OF CALIFORNIA;
BOARD OF GOVERNORS OF THE
STATE BAR OF CALIFORNIA;
SCOTT DREXEL, Chief Trial
Counsel of the State Bar of California;
and THE SUPREME COURT OF
CALIFORNIA (only as a necessary
party);

Defendants.

Case No.

VERIFIED CIVIL RIGHTS
COMPLAINT TO VOID AND
ANNUL CALIFORNIA SUPREME
COURT ORDER OF
DISBARMENT, AND PRECEDING
STATE BAR ORDER OF
INVOLUNTARY INACTIVE
ENROLLMENT, FOR FRAUD
UPON THE COURT

42 U.S.C. § 1983

DEMAND FOR JURY TRIAL

## I. Summary of Action

1. Plaintiff RICHARD I. FINE seeks an order voiding and annulling the

State Bar Hearing Department's October 12, 2007 Order of Involuntary Inactive

Enrollment, effective October 17, 2007, entered by State Bar Court Judge

Richard A. Honn, which was not affirmed in the denial of a Petition for Review

```
1/5/2010 2:02:51 PM  Receipt #: 129207
        Cashier : KPAGE [LA 1-1]
Paid by: RICHARD I. FINE
2:CV10-00048
2010-086900     5 - Civil Filing Fee(1)
Amount :                       $60.00
2:CV10-00048
2010-510000    11 - Special Fund F/F(1)
Amount :                      $190.00
2:CV10-00048
2010-086400      Filing Fee - Special(1)
Amount :                      $100.00
Cash  Payment :               350.00
```

by the California Supreme Court, and an order voiding and annulling the State Bar Review Department's September 29, 2008 Recommendation of Disbarment effective November 29, 2008, which became an order of the California Supreme Court effective March 25, 2009 after a Petition for Review and Rehearing was denied pursuant to B&P Code § 6084.

2.     The reason for the complaint is that the Chief Trial Counsel of the State Bar and the attorneys in the office of the Chief Trial Counsel of the State Bar, along with other officers of the Court on the Board of Governors and in the State Bar, committed fraud upon the California Supreme Court in bringing and pursuing the Notice of Disciplinary Charges against Fine for "moral turpitude", ordering the involuntary enrollment and recommending the disbarment.

3.     At all times they knew that the charges were false, that the charges violated the First Amendment to the U.S. Constitution, that the charges did not constitute "moral turpitude", that the charges were being brought and prosecuted for the personal benefit of members of the Board of Governors who were either representing parties adverse to Fine's clients' litigation or themselves were adverse to Fine's clients in litigation and that the charges were being brought in collusion with and aiding and abetting the judicial officers and judges of the Los Angeles Superior Court who were receiving criminal payments from Los Angeles County.  LA County was a party before such judges and judicial officers.  Fine

had challenged the LA County payments as unconstitutional under both the U.S. and California Constitutions in federal civil rights lawsuits, and had challenged the judges presiding over cases where LA County was a party.

## II.   Jurisdiction, Venue and Standing

4.      Jurisdiction exists under 42 U.S.C. § 1983 for violation of the rights protected under the First, Fourth and Fourteenth Amendments, and for the extrinsic fraud of an officer of the Court upon the Court resulting in an adverse state court decision.   (See *Kougasian v. TSML, Inc.*, 359 F.3d 1136 (9th Cir. 2004).)

5.      Venue exists in the Central District, Western Division, in that Fine resides there, the defendants maintain offices there and all events occurred there.

6.      Standing exists in that the State Bar has obtained an Order of Disbarment and a Judgment against Fine for costs as part of the disbarment, and seeks to enforce the disbarment through civil and criminal court action if Fine attempts to "practice law" or "hold himself out to practice law" in California, and has contacted other states and judicial forums seeking to have them disbar Fine, including but not limited to the U.S. District Court for the Central District of California, the Ninth Circuit Court of Appeals and the Court of Appeals for the District of Columbia.

## III. The Parties

7.      The plaintiff (Fine) has practiced law for over 42 years.  He received a B.S. from the University of Wisconsin (1961), a Doctor of Law from the University of Chicago Law School (1964), and a Ph.D. in international law from the University of London, London School of Economics and Political Science (1967).  He has practiced in London with Coudert Bros., an international law firm; been a member of the U.S. Department of Justice, Antitrust Division, in Washington D.C.; been the Special Counsel to the Governmental Efficiency Committee of the LA City Council; founded the Antitrust Division for the LA City Attorney's office, the first municipal antitrust division in the country; and, since 1974, has been in private practice in his own firm engaged in both U.S. and international cases.

8.      Fine has received various certificates of recognition for his contribution to society through his legal work, including "Lawyer of the Decades."

9.      Fine is known for fighting government corruption and misappropriation of funds by state, county and municipal governments.  As of the present time, Fine has been responsible for the return and saving of almost $1 billion dollars for California taxpayers through lawsuits brought against governments engaging in illegal acts.  Fine also won the 2003 lawsuit in the

California Supreme Court which holds that when the state does not have a budget, it cannot pay anyone.  This stopped the Governor and legislators from getting paychecks during a budget crisis while the rest of the state suffered.  At the outset of the case in 1998, Fine obtained an injunction which closed down the California government.  This angered government employees, including judges, for interfering with their paychecks.

10.    In the last ten years, Fine has been active in fighting judicial corruption.

11.    Since late 1995, Fine has also been the Honorary Consul General of Norway in Los Angeles and Southern California.

12.    Fine has been held in "coercive incarceration" since March 4, 2009 for challenging LA Superior Court Judge David P. Yaffe's presiding over a case involving LA County while taking criminal payments from LA County.

13.    Defendant State Bar of California is a public corporation established by the California Constitution.  Its members are those individuals admitted to practice before the California Supreme Court.  It can sue and be sued.  It is managed by a board of governors.

14.    Defendant Board of Governors of the State Bar (Board) is a group of State Bar members elected at various intervals, and non-members appointed by

the Governor as "public members" for set terms.   The Board has ultimate responsibility for all actions of the State Bar.

15.     Defendant Scott Drexel at all times was the Chief Trial Counsel of the State Bar.  He was appointed by the legislature and serves "the pleasure of the Board."  He reports directly to a committee of the Board.  He supervises the Office of Chief Trial Counsel (OCTC), which conducts disciplinary investigations, and brings and pursues disciplinary cases styled as Notices of Disciplinary Charges (NDC).

16.     Defendant Supreme Court of California is a defendant herein only as it is a "necessary party."  It has sole control over the right to practice law in California.

## IV.  Common Allegations

### A.     Role of the State Bar in disciplinary proceedings

17.     California has two methods to discipline attorneys.  The first is by a court of record.  However, an inactive enrollment, suspension or disbarment may only be ordered by the Supreme Court, even if the case started in a court of record.  The second is to use the State Bar as the "administrative arm" of the Supreme Court.  Under this method, the Chief Trial Counsel and OCTC initiate action by filing a NDC in the "State Bar Court."

18.     The State Bar Court is part of the State Bar.  It is not the "court of record"; i.e., it is not in the California Constitution.  It also is not a "court," nor is it an "administrative agency" subject to administrative law protections.  The State Bar Court is a group of individuals designated as state bar judges under the State Bar Act (B&P Code §§ 6079.1 and 6086.65).  They are appointed by the California Supreme Court, the Governor or the legislature for specific terms.  They are divided into a Hearing Department and a Review Department.  Their salaries are set by statute but they are paid by the State Bar, who also sets their other compensation, such as "benefits."  Under statute, they are not responsible for their decisions as they sit in the "stead" of the Board.  See B&P Code §§ 6079.1 and 6086.65.

19.     Neither the State Bar nor the State Bar Court has the power to impose any discipline on an attorney.  (See *Lebbos v. State Bar*, 53 Cal.3d 37, 48 (1991).)  They can order a person "involuntary inactive," but only subject to the immediate, independent review of the Supreme Court.   They can only recommend disbarment.  Only the Supreme Court can order a lawyer inactive if he seeks review, and only the Supreme Court can order a person disbarred.  With respect to the disbarment, B&P Code § 6084 provides that if the petition for review is denied, the Review Department's recommendation is filed as the Supreme Court's order.

20.     Article III, Section 3.5, of the California Constitution precludes the State Bar Court from considering federal constitutional claims.  (See *Hirsch v. Justices of the Supreme Court of the State of California*, 67 F.3d 708 (1995) ("Opportunity to present Federal claims – The California Constitution precludes the Bar Court from considering constitutional claims.  See Calif. Const. Art. III, Sec. 3.5.")

## B.   Criminal payments from LA County to LA Superior Court judges and other counties to judges called "judicial benefits".

21.     In the late 1980s, LA County commenced paying LA Superior Court judges "judicial benefits" in addition to their state salaries.  LA County knew that under Article VI, Section 19, of the California Constitution, only the state legislature could prescribe the compensation of the judges and that this duty could not be delegated.  They also knew that no statute allowed the payments.  In 2000, California Supreme Court Chief Justice Ronald M. George stated that the payments were wrong and may be unconstitutional in a September speech to the meeting of the California Judge Association in San Diego.

22.     The payments were held to violate Article VI, Section 19, of the California Constitution and were held to be not delegable by the legislature in the case of *Sturgeon v. County of Los Angeles*, 167 Cal.App.4th 630 (2008) rev. denied Dec. 23, 2008.  *Sturgeon* was decided on October 10, 2008, which was

before the Review Department Recommendation of Disbarment for Fine became effective.

23.     In response to the *Sturgeon* decision, the Judicial Council of California drafted, the legislature passed and the Governor signed Senate Bill SBX2-11, which was enacted February 20, 2009, effective May 21, 2009.  Senate Bill SBX2-11 gave retroactive immunity from criminal prosecution, civil liability and disciplinary action to every "officer or employee of a government entity [judge or judicial officer] because of benefits provided to a judge under the official action of a governmental entity prior to the effective date of this act on the grounds that those benefits were not authorized by law."  The criminal acts encompassed misappropriation of funds, obstruction of justice and bribery, amongst others.

**C.     Fine's history of challenges to the criminal LA County payments.**

24.     In or about 2000, upon becoming aware of the LA County payments to judges and judicial officers, Fine began challenging the correctness of judges presiding over cases where they had received money from LA County.  These challenges occurred at the moment that Fine became aware of the payments.  The challenges occurred in appellate briefs in 2000-2002 against Judge Chalfant and Justice Doi Todd in the case of *Silva v. Garcetti*; in 2002 against Judge Lewin in the federal civil rights case of *LACAOEHS v. County of Los Angeles and Lewin*;

and against Judge Chalfant, Commissioner Mitchell and Justices Boren, Nott and Doi Todd in the federal civil rights case of *Silva v. Chalfant*, et al; CCP § 170.3 objections against Judge Hubbell, Judge Bruguera and Commissioner Mitchell in various cases in 2004; CCP § 170.3 objection against Judge Bruguera in the case of *Coalition to Save the Marina, et al, v. County of Los Angeles, et al,* (four consolidated cases) and Writ of Mandate, followed by appellate brief; 2008 CCP § 170.3 objection in the case of *Marina Strand Colony II Homeowners Association v. County of Los Angeles* followed by writ of habeas corpus.

**D.    The criminal County payments to the judges show that the counts in the NDC are a sham.**

25.    The NDC originally contained 22 counts of "moral turpitude." Each count was based solely upon a document filed in a court. This violates the First Amendment unless a false statement is proven.  After the completion of the Review Department hearing, all but eight counts in the NDC had been dismissed. The Review Department had reinstated two counts (4 and 19) which the Hearing Department had dismissed and the OCTC had not appealed.   The Review Department had done this without notice or hearing, in violation of State Bar Rule of Procedure Rule 305 and due process.  (See *In Re Ruffalo*, 390 U.S. 544 (1968).)

26.    The eight remaining counts were Counts 1, 5, 6, 8-9, 14, 16, 18 and 20-22.  The judicial officers who took the criminal payments were Mitchell –

Counts 1, 4, 5, 8-9, 14, 16, 18, 20-22; Doi Todd – Counts 16, 18, 20-22, Czuleger and Dukes – Counts 20-22.  Boren and Nott, who concealed Doi Todd's actions, were in Counts 18 and 20-22, and Honn, who took payments from Orange County, was in Count 8-9.  Lewin is in Count 17.

**E.     Six California Supreme Court Justices are involved with the County criminal payments.**

27.     Five California Supreme Court Justices received criminal payments while they were Superior Court judges, based upon a review of their official biographies.   These are Chief Justice George and Justices Chin, Corrigan, Kennard and Moreno.  Further, Chief Justice George and Justice Baxter are on the California Judicial Council that drafted Senate Bill SBX2-11.

28.     These six denied Fine's Petition for Review and refused to recuse themselves.  The U.S. Supreme Court case of *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986) held that due process was violated by an Alabama Supreme Court justice who cast a deciding vote against an insurance company while he was the lead plaintiff in a nearly identical case.  In Count 18 of the NDC, Fine was held to have committed "moral turpitude" for filing the *Silva* case, a federal civil rights defendants class action suit seeking to enjoin the LA County payments to LA Superior Court judges on the grounds that they violated Article VI, Section 19, of the California Constitution, the First Amendment and the

Fourteenth Amendment.  The *Sturgeon* case and Senate Bill SBX2-11 showed that Fine was correct in his charges in the *Silva* case.

29.     On December 8, 2009, Fine submitted a motion to the California Supreme Court to "set aside and void disbarment."   The California Supreme Court refused to file the motion.

**F.    The State Bar's concealment of:**
   **a) Mitchell as the complaining witness;**
   **b) The fact that Mitchell was not a judicial officer in the *De Flores* case;**
   **c) The void California appellate case of *Fine v. Superior Court*;**
   **d) Mitchell's distribution of $2,550,600 from the *De Flores* settlement fund in violation of the final judgment;**
   **e) Mitchell's financial and other acts against the interests of class members.**

30.     In response to Fine's motion to dismiss the NDC before the State Bar Hearing Department, OCTC lawyer Gerald E. Magnuson stated in a declaration that the State Bar initiated the investigation against Fine which resulted in the NDC.   This statement was proven to be false when LA Superior Court Commissioner Bruce E. Mitchell (Mitchell) unexpectedly appeared as a hearing spectator over a year later and stated that he was the "complaining party." (State Bar Transcript, Vol. 4, pp. 60-61.)  The State Bar had never revealed Mitchell's identity, even though he was involved in every case upon which the NDC was based but the *LACAOEHS v. Lewin* case (the "Lewin" case), and had received criminal payments from LA County.

31.     The State Bar founded the NDC on the false premise that Mitchell was a judicial officer and the "temporary judge" for post-judgment proceedings in the case of *De Flores, et al, v. EHG National Health Svcs., et al*, LASC case no. BC150607 (the "*De Flores*" case).  This false premise affected Counts 1, 5, 14 and 20-22.  The true fact is that Mitchell never was a "temporary judge" for post-judgment proceedings in the *De Flores* case as no one executed a stipulation as required under Article VI, Section 21, of the California Constitution, and CCP § 259(d).  This fact was further emphasized on August 21, 2002 when Mitchell, acting as the LA Superior Court, voided and annulled the September 24, 2001 Order and Judgment of Contempt in which he claimed he was a "temporary judge" for post-judgment proceedings.  He (the LA Superior Court) took action in response to an August 12, 2002 order to show cause re granting immediate habeas corpus relief without hearing in the federal case of *Fine v. Superior Court*, USDC case no. CV-02-4647.

32.     This August 21, 2002 order also voided and annulled the case of *Fine v. Superior Court*, 97 Cal.App.4th 651 (April 2002), which affirmed the now void and annulled September 24, 2001 order and judgment of contempt.  (A void order is void *ab initio*; *Valley v. Northern Fire and Marine Co*., 254 U.S. 348 (1920).  No court has the lawful authority to validate a void order; *U.S. v. Throckmorton*, 98 U.S. 61 (1878).  All orders based on void orders are themselves void; *Austin v.*

*Smith*, 312 F.2d 337, 343 (1962) ("if the underlying judgment is void, the judgment based on it is also void."). Any action taken by Mitchell was void. Any action that relied on an action taken by Mitchell was void. This removed Counts 1, 5, 14 and 20-22 of the NDC. It also removed Count 4, which had been unlawfully reinstated.

33. The *De Flores* stipulation of settlement, which was approved by the stipulated order of judgment (final judgment), provided for the disbursement of the $7.86 million settlement fund at Section 5, paragraph 5.2(a)-(d). In the summer of 1999, Mitchell moved the $7.86 million from Wells Fargo Bank to Bank of America, where his Form 700 financial interest statement showed that he had personal loans. In 2000, he spoke of using the *De Flores* settlement fund to pay attorneys in the case to defend against an appeal of his actions by Fine. Mitchell was no longer a "temporary judge" after August 28, 1999. In 2005, Diane Goldman, Marc Brauer and the firm Gelfano and Gelfano applied for fees for such defense and were paid in 2006. This payment violated Section 5, paragraph 5.2(b) of the stipulation of settlement. It also showed that Mitchell "misappropriated" funds for his defense of the 2000 appeal, making Count 4 of the NDC false and a sham.

34. On April 1, 2005, Mitchell approved a stipulation of settlement and mutual release under which the settlement class in the *De Flores* case would

purchase, through the Court, all claims of Richard Fine against "the Superior Court, Bruce E. Mitchell and other judicial officers" for $80,000, paid by the *De Flores* settlement fund. Such purchase violated Section 5, paragraph 5.2(b) of the stipulation of settlement. Mitchell then paid John Moe III and Peter Leeson IV of the firm of Luce, Forward $300,000.00 from the *De Flores* settlement fund to defend such purchase. Mitchell then, on July 26, 2006, awarded lawyers in the *De Flores* case $1.6 million in fees in violation of Section 5, paragraph 5.2(a) of the stipulation of settlement on the condition that they would "hold back" 34%, or $566,684.65, to further pay to defend the purchase. The total amount unlawfully paid for the purchase and the related attorney's fees from the *De Flores* settlement fund was $1,980,000, in violation of Section 5, paragraph 5.2(a) and (b) of the stipulation of settlement. (See Appendix to July 26, 2006 Order in the *De Flores* case for the above expenditures and State Bar joint trial exhibit 180.) U.S. Bankruptcy Judge Sheri Bluebond also approved the April 1, 2005 settlement and mutual release agreement knowing that it violated the stipulation of settlement and mutual release settlement in the *De Flores* case and was an unlawful taking of funds from the *De Flores* settlement fund. U.S. District Court Judge Ann Marie Stotler was also made aware of the violation of the stipulation of settlement and the unlawful taking of funds from the *De Flores*

settlement fund in the litigation ensuing over the settlement agreement and mutual release.  She did nothing.

35.     Mitchell unlawfully paid out approximately $567,000 of other monies from the *De Flores* settlement fund in violation of Section 5, paragraph 502(b) of the stipulation of settlement.  The recipients were: Byron Moldo, for acting as "receiver," "notice giver" and "attorneys work" – estimated $510,172, he was employed only to be a "disbursing agent," i.e. check writer; Diane Karpman of Karpman & Associates – estimated $55,980, as an "ethics expert" to assist "plaintiff's attorneys"; Bernard George Investigations – estimated $10,146 as an "investigator" to investigate Fine; Tovar & Cohen - $800 to hire a medical expert for court when no court appearance was contemplated as the stipulation of settlement provided for a private judge to decide the value of each class member's claim; and $768 to purchase a scanner for an unstated purpose.  These unlawful expenditures were part of an accounting presented by the disbursing agent for a March 13, 2006 hearing in the *De Flores* case before Mitchell.  (See State Bar joint trial exhibit 180.)

36.     The total monies paid out by Mitchell in the *De Flores* case was approximately $2,550,600, in violation of Section 5, paragraph 5.2(a) and (b).

37.     In the case of *McCormick v. Reddi-Brake Supply Corp., et al*, Mitchell upset a settlement of a $20 million judgment and a right to collect

against a $5 million insurance policy because Fine was class counsel.  The class later settled for $1.5 million without Fine.  In the case of *Churchfield v. Wilson*, Mitchell decertified the class because Fine was class counsel.  The case died.  A previous identical class action case had settled against the State of California with Fine as class counsel and each claimant received 100% of their loss.  In the case of *Debbs v. Calif. Dept. of Veterans Affairs*, Mitchell decertified a class of thousands of veterans, who had been overcharged on Cal Vet home loans, because Fine was class counsel.  In the case of *PSO v. Sony, Sharp and Toshiba*, Mitchell refused to certify a class because Fine would be class counsel after Fine had won the certification issues on appeal.  Previously, before another judge, 25 other consumer electronics and computer companies had settled the class action case.  In the case of *Shinkle, et al, v. City of Los Angeles* (the "*Shinkle*" case), Mitchell denied class certification on substantive grounds instead of certification grounds.  This violated the holding of *Linder v. Thrifty Oil*, 23 Cal.4th 429 (2000).  In the *De Flores* case, Mitchell removed Fine as "class counsel" even though there was not a class counsel for the settlement class set forth in the stipulation of settlement, approved in the final judgment.  Mitchell was trying to alter the substance of the final judgment.  Under CCP § 473d, he was prohibited from doing such.

38.    Mitchell's activity against Fine commenced with the denial of certification in the *Shinkle* case in 1999, followed by the removal as "class counsel" in the *De Flores* case in 2000, followed by the decertification, etc., in 2000-2001, based upon his action in the *De Flores* case.

39.    Prior to Mitchell's first action to remove Fine as a class counsel, Lewin had denied Fine attorney's fees after Fine had prevailed in the case of *Amjadi and LACAOEHS v. LA County Board of Supervisors*.  In this case, Fine stopped the County from taking approximately $45 million per year of environmental fees and putting such in the general fund.  Fine won an injunction to establish a "special fund" and place the money in it.  $11 million was immediately taken from the general fund and placed in the "special fund."  All new environmental fees were frozen until the $11 million was expended.  The environmental fees in the "special fund" could only be used for special purposes.  As of the present time, the special fund has probably collected $500 million.

40.    Judge Lewin concealed the fact that he was receiving payments from LA County.  LA County Counsel also concealed that fact.  Lewin denied Fine attorney's fees.  Fine challenged Lewin as biased for his anti-union position and appealed.  Fine later found out about the concealed LA County payments and filed the *Lewin* federal case.

41.     During this same time, Fine was fighting the lawsuit of *Silva v. Garcetti* to obtain $14 million of child support monies for women and children that the LA County District Attorney had illegally held for over six months. The LA County District Attorney admitted to the violation. At the end of the trial, Judge Chalfant dismissed the case. Chalfant concealed the fact that he was receiving payments from LA County. The LA County Counsel concealed the fact that LA County was making the payments. When Fine found out, he raised the issue in the appeal.

42.     During the same time, Mitchell, who was also receiving payments from LA County and concealing such, began acting against Fine as set forth above.

**G.     The LA Superior Court and the State Bar join forces against Fine.**

43.     After the LA County payments became an issue raised by Fine, James A. Basque, the then- or former presiding judge of the LA Superior Court, filed a complaint against Fine with the State Bar. Basque had fought to stop the legislature from removing the law allowing local courts to pass rules to accept County payments, even though the 1997 Lockyer – Isenberg Trial Court Funding Act required the state to pay all trial court costs. Fine did not know Basque and had never appeared before him. A sham NDC was filed in April 2003 by the

State Bar. It was dismissed by the State Bar on February 2, 2004 "in the furtherance of justice" after Fine had filed a motion to dismiss.

44. By 2003, Fine had filed:

A. *LACAOEHS v. County of Los Angeles and Lewin* and *Silva v. Chalfant, et al* – both federal civil rights cases alleging that the LA County payments to the LA Superior Court judges violated Article VI, Section 19, of the California Constitution;

B. Arguments in appellate briefs against Judge Chalfant and Justice Doi Todd for having taken LA County payments, concealed such and judged LA County cases, and against Justices Boren and Nott for having concealed Judge Doi Todd's actions; and

C. CCP § 170.3 objections and motions to recuse LA Superior Court judges based upon the LA County payments issue.

45. In May of 2004, Fine commenced filing a series of four cases challenging the leases of LA County land in Marina del Rey, California, to developers to develop private apartment complexes, boat slips and businesses as an unconstitutional gift of public property to private individuals. The cases were consolidated under *Coalition to Save the Marina and Marina Tenants Association, et al, v. County of Los Angeles, et al*, LASC case no. BS089838. Fine filed a CCP § 170.3 objection against Judge Bruguera, based upon her

taking payments from LA County, and moved to have the cases transferred out of LA County.   Judge Bruguera "struck" the objection and denied the motion.   Fine took writs to the Court of Appeal and the California Supreme Court.   These were summarily denied.

46.     In September 2006, Fine was informed in a letter from Itzel Berrio, Asst. General Counsel of the California State Bar, that a complaint had been filed against him in September 2004 and that such complaint was the basis of the NDC filed February 2, 2006.   As stated above, Mitchell identified himself as the "complaining party".   At all times, the State Bar concealed Mitchell's identity. The Berrio letter further stated that the State Bar researched 30 cases in which Fine had participated in order to bring its charges, from which it selected five main cases.   Four involved Mitchell.   Four involved LA County payments in some form.   Two counts of the NDC challenged the filing of the *Lewin* and *Silva* cases as "moral turpitude."   The NDC also alleged that the filing of the federal civil rights lawsuit of *Fine v. Mitchell* in 2003 constituted "moral turpitude" as it pursued the same claim for relief as in *Lewin* and *Silva*.     As shown above, *Sturgeon*, supra, and the retroactive immunity provided by Senate Bill SBX2-11 dispels any question of Fine's conduct, much less "moral turpitude" for CCP § 170.3 objections against Mitchell in the *Debbs*, *Churchfield*, *McCormick* and *PSO* cases.   Mitchell never answered or struck the objections; he responded

instead with an illegal "striking or in the alternative answer."   (See *Lewis v. Superior Court of LA County*, 198 Cal.App.3d 1101 (1988); *PBA, LLC v. KPOD, Ltd.*, 112 Cal.App.4[th] 965 (2003).)   Mitchell was disqualified under CCP § 170.3(c)(4).   Mitchell's responses were legally void.

### H.   Two successive State Bar presidents and a "public member" of the Board are on adverse sides to Fine in cases.

47.   In 2004, Fine filed the case of *Coalition to Save the Marina, et al, v. County of Los Angeles* challenging LA County's "seaworthy ordinance."   In May 2005, the case was answered to include Marina Pacific Association (MPA), a lessee in Marina del Rey who was evicting boaters.   The local general partner for MPA was the Epstein Family Trust.   The trustees were Jerry B. Epstein and Pat Epstein.   One of their attorneys was Sheldon H. Sloan, a member of the Board, and President of the State Bar in 2006-2007.   On July 7, 2005, MPA filed a counterclaim for breach of the boat slip lease which the California Court of Appeal later commented could not succeed as it did not allege failure to pay rent, did not show damages and showed that the boat slip lease was replaced with a temporary moorage contract.   Sheldon H. Sloan and his client, Epstein, had an interest in removing Fine from practice.

48.   In January 2006, Fine was retained by the Marina Strand Colony II Homeowners Association to oppose an Environmental Impact Report (EIR) for the redevelopment of the Del Rey Shores apartment complex in Marina del Rey,

California. The co-applicants were the County of Los Angeles and Del Rey Shores Joint Venture and Del Rey Shores Joint Venture North (Del Rey Shores). The local general partner of Del Rey Shores was the Epstein Family Trust. The trustees were Jerry B. Epstein and Pat Epstein.

49. As part of the Del Rey Shores development, the Epsteins negotiated an option for a lease extension with LA County. This was a requirement in the EIR to show financial benefit to LA County. The documents showed that LA County was represented by Munger, Tolles and Olson. Jeffrey Bleich was a partner with Munger, Tulles and Olson. He was also a member of the Board and succeeded Sheldon H. Sloan as the President of the State Bar for 2007-2008. He, his firm and their client had an interest in removing Fine from practice.

50. During the year 2006, Jerry B. Epstein, Pat Epstein and David B. Levine (of the office of Jerry B. Epstein) contributed $4,600 to LA Supervisors Antonovich, Burke and Knabe. In April 2007, contributions in excess of $4,700 were given to LA Supervisors Antonovich and Knabe by the Epstein interests. On May 15, 2007, four LA Supervisors, including Antonovich and Knabe, voted to certify the EIR for the Del Rey Shores redevelopment. The votes of Supervisors Antonovich and Knabe were illegal as they had received contributions from an interested party (the Epsteins) of greater than $500 within twelve months of the vote. (See *BreakZone Billiards v. City of Torrance*, 81

Cal.App.4th 1205 (2000).)  The EIR was not lawfully passed as it only received

two qualified votes; three were needed for lawful passage.

51.     In June 2007, Fine filed suit against LA County to void the EIR in

*Marina Strand Colony II Homeowners Association v. County of Los Angeles*,

LASC case no. BS 190420.  The case was before LA Superior Court Judge David

P. Yaffe.  Judge Yaffe received illegal payments from LA County but did not

disclose such in violation of California Code of Judicial Ethics Canons 2A and B,

3B(5), (7) and (8), 4A(1) and (3), and 4D(1)(a) and (b).  Additionally, since the

payments were criminal under Senate Bill SBX2-11's retroactive immunity, he

should have recused himself.  (See *Offutt v. United States*, 348 U.S. 11, 14 (1954)

– " a judge receiving a bribe from an interested party over which he is presiding

does not give the appearance of justice." *Levine v. United States*, 362 U.S. 610

(1960) – "justice must have the appearance of justice."

52.     In 2006, Fine was retained by the Grassroots Coalition to enforce a

writ of mandate against the City of Los Angeles in the case of *Aetna v. City of*

*Los Angeles and Playa Vista Capital Corp.*, LASC case no. BS073182.  Laura

Chick was the City Controller for the City of Los Angeles.  During 2006-2007,

she was appointed to the State Bar Board of Governors as a public member.

53.     On or about June 5, 2007, Laura Chick, through her office, made a

favorable report regarding the Building Department inspections at the Playa Vista

development. The next day, a $5,000 "behest" was given in her name to a charity by Latham & Watkins, the attorneys and lobbyists for Playa Vista Capital Corp., the developers for Playa Vista. A "behest" cannot be given without the prior approval of the office holder. The comment period for the report was still open when the "behest" was given. Fine raised the issue in the Playa Vista lawsuit that the "behest" was illegal. Laura Chick had an interest in removing Fine from practice.

54.     Laura Chick had been a LA City Councilperson during the time of the *Shinkle* case. The *Shinkle* case was one of the cases in the NDC. Fine brought the case against the City of Los Angeles to reduce the sewer service charges and to obtain damages for the residents who had been overcharged by the City of Los Angeles. After the suit was brought, the LA City Council voted to reduce the sewer service charges as set forth in the suit. However, due to the unlawful action of Mitchell in denying class certification, and a later granting of summary judgment in the individual case, only the injunctive relief was obtained by the City Council vote. Laura Chick had an interest in the counts in the NDC relating to the *Shinkle* case as such reflected on the conduct of the City of Los Angeles while she was a councilperson.

55.     The State Bar Act makes it a misdemeanor for a Board member to not disclose a conflict. Since neither Sloan, Bleich, nor Chick have been charged

or convicted of a misdemeanor, it can only be assumed that the State Bar, the OCTC and the State Bar Court knew of their conflict.   None of these entities disclosed such conflict to the California Supreme Court in any document filed with the Court.

**I.      Continued retaliation against Fine by LA Superior Court judges.**

56.      In 2007, the LA Superior Court judges further retaliated against Fine through the actions of Judge John P. Shook.   In the case <u>Winston Financial Services Inc. v. Fine</u>, et al, a judicial foreclosure case, Winston and his attorney Goe and Forsythe (Robert P. Goe and Marc C. Forsythe) admitted in court papers in 2007 that they had committed a false foreclosure on Fine's residence.   They admitted that Winston, who purported to be the beneficiary of a trust deed on Fine's residence, was not the real beneficiary and had committed the false foreclosure.   When Fine brought a motion to overturn the lawsuit based upon Winston's fraud upon the Court, Judge Shook denied the motion.

J.      State Bar Court Hearing Department Judge Richard A. Honn did not disclose that he was on the Board of Governors of a charity (the Southern California Special Olympics) that received $30,000.00 from LA County while he decided Fine's case. 57. State Bar Court Hearing Department Judge Richard A. Honn sat on the Board of Governors of the Special Olympics – Southern California during the time he presided over Fine's case.

58.     During the same time period, LA County documents show that LA County contributed $30,000 to the charity. Honn did not disclose the contributions nor his membership. The NDC included numerous counts charging Fine with "moral turpitude" for filing lawsuits alleging that the LA County payments to the LA Superior Court judges violated the U.S. and California Constitutions, and for filing CCP § 170.3 objections to judges regarding such payments. Honn held Fine guilty on all seven counts.

59.     Honn was under a duty to recuse himself under Code of Judicial Ethics Canons 2A and 2B, and 4A(1) and (3).  He has also destroyed the "appearance of justice" and denied due process like the mayor in *Monroeville*, supra, who was not paid to be a judge, but the fines he assessed went into the town "fisc.", which, as mayor, he managed.  Although Honn did not get money personally from LA County, as a member of the Board of Governors, he managed the money that was given to his organization.   He was still benefitting.

K.     Judge Honn and Review Department Judges Remke, Epstein and Stuvitz had pre-decided that Fine's court filings were not protected by the First Amendment and that the moral turpitude statute did not violate the First Amendment, even though Article 3.5 of the California Constitution precluded them from doing such.

60.     The California Constitution precludes the State Bar Court from considering federal constitutional claims.   (See Calif. Const., Art. III, Section 3.5.)   Fine had moved to dismiss the NDC in the Hearing Department.   Honn denied the motion.

61.     Fine again moved to dismiss on First Amendment grounds in the Review Department.   The OCTC responded that it was not challenging the statements in Fine's papers, Fine's rhetoric or Fine's speech.   There was nothing left in the case, as each count in the NDC referred to a document filed in court.   Judges Remke, Epstein and Stovitz refused to consider any constitutional claim by falsely claiming that it had not been raised in the trial court.   Such action violated Article III, Section 3.5, which prohibits them from even deciding a constitutional issue.   They were bound to refrain from "deciding" the First Amendment issues.

62.     They had previously opposed the argument that the "moral turpitude" law was unconstitutional in the cases of _Canatella v. State Bar of California_, et al, 304 F.3d 843 (Ninth Cir. 2006) and _Canatella v. Stovitz, et al_, case no. 05-15447; 213 Fed. Appx 515 (2006) (appellate opinion, not for publication).

63.     In both cases, the Chief Trial Counsel was also a defendant, as was the President of the State Bar.   This shows a unity of interest on these issues and pre-decision in Fine's case.

64.     In a situation where he had spoken on a subject which later appeared before the Court, i.e. the Pledge of Allegiance to the flag, Justice Scalia recused himself.  (See *Elk Grove Unified School Dist. v. Newdow*, 124 S.Ct. 2301 (2004).)  Judges Honn, Remke, Epstein and Stovitz violated Code of Judicial Ethics Canons 2A and B.

**L.     The Money Trail – The connections between the criminal payments to the judges, the contributions to the Supervisors, the $30,000 contribution to Honn's charity and the State Bar's action for Fine's "involuntary enrollment" and disbarment.**

65.     Since the late 1980s, LA County has been making criminal payments to LA Superior Court judges.  In 2007, as shown in the *Sturgeon* case, these payments were approximately $46,436 per year in addition to the judge's state compensation.  Their state salary, excluding benefits, was approximately $178,800 per year.  The LA County payments were approximately 27% of their state salary.    Their total compensation, including state benefits, was approximately $249,000 per year.  LA County was paying $21 million per year to the judges.

66.     LA County Counsel Annual Litigation Reports for FY 2005-2006 and 2006-2007 showed that no person won a case against LA County when a Superior Court judge made the decision.  This was in contrast to the opponents winning before a jury.  For FY 2007-2008, it could not be determined if two winning cases were jury verdicts or judicial decisions as the reports did not

distinguish between judge and jury actions. In FY 2008-2009, one case was decided against LA County by a judge.

67.    The LA Superior Court first came to the State Bar through Judge Basque, a then-presiding or recently presiding judge of the LA Superior Court, to file a complaint against Fine. Fine had been challenging the LA County payments to the LA Superior Court judges. A NDC was filed in April 2003 and dismissed by the State Bar "in the furtherance of justice" on February 2, 2004 after Fine had moved to dismiss.

68.    In September 2004, the LA Superior Court again complained to the State Bar through Mitchell, who had been a defendant in the *Silva* case. Mitchell had received criminal LA County payments while sitting as a "temporary judge" assigned to the Eminent Domain Department of the LA Superior Court. The State Bar never disclosed Mitchell's identity. Mitchell filed his complaint after Fine had filed a CCP § 170.3 objection to Judge Bruguera in the consolidated cases of *Coalition to Save the Marina and Marina Tenants Association, et al, v. County of Los Angeles, et al*. The objection was based upon the LA County payments to Judge Bruguera. Fine had moved to transfer the cases out of Los Angeles. Judge Bruguera "struck" the motion. Fine filed writs. She denied the motion to transfer. Ultimately, she dismissed the cases. The LA County

taxpayers lost approximately $700 million in rent from developers as a result, which they should have received if the cases had prevailed.

69.    The State Bar investigated thirty cases in which Fine was involved, seeking reasons to bring charges which were different from those dismissed in 2004.  Those took until February 6, 2006, when the NDC was filed.  The State Bar stretched back to 1999 and 2000 for actions relating to Mitchell, which were beyond the five-year statute of limitations, in addition to not being violations.

69.    In late 2004, Fine filed the *Coalition to Save the Marina v. County of Los Angeles* case, testing the constitutionality of the LA County's "seaworthy ordinance."  In March 2005, Marina Pacific Associates was added as a defendant. On July 7, 2005, MPA filed a meritless counterclaim based upon a boat slip lease.  One of the attorneys for MPA was Sheldon H. Sloan, a member of the Board of Governors and State Bar President in 2006-2007. The local managing Partner of moa was the Epstein family trust whose  trustees were Jerry B. Epstein and Pat Epstein.

71.    In January 2006, Fine was retained by the Marina Strand Colony II Homeowners Association to oppose the EIR for the redevelopment of Del Rey Shores.   The co-applicants were LA County and Del Rey Shores.  Del Rey Shores' local managing partner was the Epstein Family Trust, whose trustees were Jerry B. Epstein and Pat Epstein.

72.     The law firm representing LA County in negotiating a lease extension with Del Rey Shores as part of the EIR was Munger, Tolles and Olson. One of their partners, Jeffrey Bleich, was a member of the Board of Governors of the State Bar and succeeded Sheldon H. Sloan as President for 2007 - 2008.

73.     On May 15, 2007, the LA County Board of Supervisors approved the EIR on an illegal 4-1 vote.  Two of the votes, Antonovich's and Knabe's, were illegal because they had received contributions of greater than $500 from the Epsteins and their employees within 12 months prior to the vote.

74.     In June 2007, Fine filed the case of *Marina Strand Colony II Homeowners Association v. County of Los Angeles* to void the EIR due to the illegal votes.  LA Superior Court Judge David P. Yaffe did not void the EIR.

75.     On January 8, 2008, long after Fine left the case, Judge Yaffe, without prior notice to Fine, issued an unlawful order for Fine to pay attorney's fees and costs to LA County and Del Rey Shores, then held Fine in contempt and ordered him jailed under "coercive incarceration" while Fine fought the question: "whether the trial court judge [Judge Yaffe] should have recused himself" by a writ of habeas corpus.   Fine has been imprisoned in the LA County Jail since March 4, 2009.  Judge Yaffe admitted, on March 20, 2008, to taking LA County payments, was disqualified on April 7, 2008, and refused to leave the case.  On December 22, 2008, Yaffe testified at the contempt trial that he received the LA

County payments, that he did not report them on his Form 700 Statement of Economic Interests, that he did not have any employment agreement or arrangement for services with LA County and that he could not remember any case in the last three years that he decided against LA County.

76. In 2006, Fine was retained by the Grassroots Coalition to enforce a Writ of Mandate against the City of Los Angeles in the case of *Aetna, et al, v. City of Los Angeles and Playa Vista Capital Corp.* LA City Controller Laura Chick had an illegal "behest" given in her name by Latham & Watkins to a charity the day after she issued a report favorable to Playa Vista Capital Corp. Latham & Watkins was the law firm in the litigation and the lobbyist for Playa Vista Capital Corp.

77. On February 6, 2006, when the NDC was filed, it was assigned to Hearing Department Judge Richard A. Honn. Honn presided over the case until October 31, 2007, when he denied the post-trial motion. During such time, he was a member of the Board of Governors of the Special Olympics -- Southern California. Documents from LA County show that, during such time, LA County contributed $30,000 to the Special Olympics -- Southern California. Honn found Fine guilty of almost all counts in the NDC. He did not find Fine guilty of making false statements, which were Counts 2, 4 and 17.

78. The money trail is as follows:

a.   LA County Supervisors make criminal payments to the LA Superior Court judges and court commissioners sitting as "temporary judges";

b.   The LA Superior Court judges and "temporary judges" decide cases in favor of LA County;

c.   LA Superior Court judges and "temporary judges" also decide cases against Fine (who had challenged such LA County payments) and his clients;

d.   The LA Superior Court, through its presiding judge or "former presiding judge," and a commissioner "temporary judge" complain about Fine to the State Bar:

e.   The complaint targets Fine's challenges to the LA County payments to the judges;

f.   Epstein and his employees make contributions to LA County Supervisors Antonovich and Knabe which result in the unlawful approval of an illegal EIR;

g.   LA County criminal payments are made to Judge Yaffe, who does not void the EIR and incarcerates Fine;

h.   Sloan and Bleich, lawyers for Epstein and LA County, are Board members and successive presidents of the State Bar;

i.    Chick becomes a "public member" of the Board after the NDC is filed and during the proceedings;

j.    Honn's charity receives $30,000 from LA County while he presides over Fine's case.  Honn decides that Fine's filing cases challenging the LA County payments to LA Superior Court judges is "moral turpitude."

79.    In summary: Epstein contributed to the LA County Supervisors, the Supervisors illegally decide for Epstein; LA County makes criminal payments to LA Superior Court judges, the LA Superior Court judges decide for LA County, the LA Superior Court complains about Fine to the State Bar; lawyers for Epstein and LA County are on the Board of Governors and become two presidents of the State Bar; the State Bar files an NDC; Chick becomes a public member of the board; LA County contributes $30,000 to the charity where the Hearing Department judge who is presiding over the case is a member of the Board of Governors; Fine is convicted of "moral turpitude" and disbarred for challenging the LA County payments to the judges and challenging the judges and judicial officers who took the criminal payments.

80.    The money trail reaches the California Supreme Court as the official biographies show that Chief Justice George and Justices Chin, Corrigan, Kennard

and Moreno would have received criminal County payments when they were Superior Court judges.

**M.**  **First Cause of Action for violation of civil rights based upon extrinsic fraud upon the Court**.

81.  Plaintiff incorporates paragraphs 1 through 80, and each of them, as if set forth in full.

82.  Defendants have violated the First, Fifth and Fourteenth Amendments to the U.S. Constitution by committing extrinsic fraud upon the Court. Such extrinsic fraud consisted of the filing of a NDC on February 6, 2006, knowing that such was false and a sham; not dismissing the NDC and allowing the October 12, 2007 Hearing Department Order of Involuntary Inactive Enrollment and Recommendation of Disbarment to proceed while knowing such was a sham and unconstitutional, and not dismissing the NDC and allowing the September 28, 2008 Review Department Recommendation of Disbarment to proceed to the California Supreme Court while knowing that the remaining counts in the NDC were false, a sham and unconstitutional.

83.  At all times the State Bar defendants knew that Fine had not made any false statements in any pleadings set forth in the NDC. This was particularly true for Counts 2, 4 and 17, which alleged false statements and were dismissed for such having not been proved by the Hearing Department Judge. The State Bar did not appeal such dismissal. The State Bar defendants committed fraud

upon the Supreme Court by allowing the Review Department's illegal Recommendation overturning the dismissal of Counts 4 and 17 in violation of State Bar Rule of Procedure Rule 305 and without notice of hearing in violation of due process as set forth in *Ruffalo*, supra, and knowing that such counts were false and a sham.  The Supreme Court was deceived.

84.    Count 4 of the NDC alleged that Fine made a false statement when he charged in an appeal that Mitchell "misappropriated" monies from the *De Flores* settlement fund.  The truth is that the State Bar defendants knew from the *De Flores* accounting documents and the 2005 petitions for attorney's fees that Mitchell had misappropriated monies from the *De Flores* settlement fund in violation of Section 5, paragraphs 5.2(a) and (b) to pay the attorneys to defend him in the 2000 appeal.  The State Bar defendants did not disclose such to the California Supreme Court.  The State Bar defendants, as officers of the Court, deceived the Supreme Court.  The Supreme Court was deceived.

85.    Count 17 charged Fine with making a false statement because he paraphrased Judge Lewin's statement that it was "bad for County unions to sue the County" as the reason for Judge Lewin not awarding attorney's fees, instead of reciting Judge Lewin's other reasons.  The statement was made in the *Lewin* complaint charging Lewin with violating Article VI, Section 19, of the California

Constitution, the First and Fourteenth Amendments, and the Code of Judicial Ethics for taking payments from LA County.

86.     The truth is that the State Bar defendants knew that Count 17 was false because they knew that the reasons that Lewin had given, other than the fact that LACAOEHS was an employee union, were false and that Lewin was being paid money from LA County during the case and not dismissing it.   They particularly knew from the *Amjadi* case and Fine's victory that Lewin was making false statements when he stated that the suit had not conferred a benefit when it created a $45 million fund and froze environmental fees, that the union did not show a necessity for the suit when the suit stopped LA County from stealing $45 million a year from environmental purposes and unnecessarily raising fees, and that the suit was brought as part of a labor dispute and giving fees would encourage this type of conduct, for which there was no proof.   The State Bar defendants concealed this information, as it did with Count 4.

87.     The State Bar defendants knew that, as to all other counts in the NDC, disciplinary rules can not punish activity protected by the First Amendment. (See *Matter of Dixon*, Review Dept. (1999) 4 Cal. State Bar Ct. Rptr. 23, 30 (1999).)   They knew that the First Amendment encompassed the right to petition the government to redress a grievance, the freedom of speech,

and "the right of a citizen to severely criticize the performance of the government and the courts is beyond cavil." (*Garrison v. Louisiana*, 379 U.S. 64 (1964).)

88.     Removing Counts 4 and 17 from the NDC, all other counts were founded in statements made in pleadings filed in courts.  All were truthful.  The State Bar defendants knew that disciplinary charges could not be brought against any such statement and that all such statements were protected by the First Amendment.  They also knew that Fine was correct in the underlying law.

89.     In response to Fine's First Amendment argument, the OCTC stated in its Respondent's Brief in the Review Department that it was not prosecuting Fine for the content of his statements, his rhetoric or his speech.  By allowing the Review Department decision to go to the Supreme Court, the State Bar defendants, as officers of the court, deceived the Court.  The Supreme Court was deceived.

90.     After the decision of the Review Department, only Counts 1, 5, 6, 8-9 (treated as one), 14, 16, 18 and 20-22 (treated as one), remained.

91.     All of those counts involve Mitchell, the "complaining party" whom the State Bar defendants never disclosed.   The State Bar defendants colluded with Mitchell to hide the fact that he was not a "temporary judge" for post-judgment proceedings in the *De Flores* case, that he unlawfully approved the taking of approximately $2,550,600 from the *De Flores* settlement fund, of which

approximately $1,980,000 benefitted the "LA Superior Court, Bruce E. Mitchell and other judicial officers" by purchasing all claims Fine had against them and defending the purchase, and that he had received criminal judicial payments from LA County while acting as a "temporary judge" in the Eminent Domain Dept. of the LA Superior Court.

92.     The State Bar defendants were colluding with Mitchell against Fine, who had reported his conduct to the Commission on Judicial Performance. (See State Bar trial joint exhibit 180), to intimidate Fine by bringing the NDC.

93.     This action was done by the State Bar defendants as officers of the Court to deceive the Supreme Court. It deceived the Supreme Court. The Supreme Court was deceived.

94. The State Bar defendants knew at all times that the "complaining party" was Mitchell and that the Gerald E. Magnason Declaration was false. By concealing such information from the Supreme Court, they deceived the Supreme Court. The Supreme Court was deceived.

95.     The State Bar defendants were colluding with and aiding and abetting the LA Superior Court, who had received criminal payments, to file and prosecute a false and sham NDC against Fine, who was challenging the criminal LA County payments to LA Superior Court judges.

96.     This action was done by the State Bar defendants to deceive the Supreme Court. It did deceive the Supreme Court.

97.     The State Bar defendants acted against Fine for their personal financial gain and the financial gain of their clients by filing and prosecuting a false and sham NDC. In doing so, they acted as officers of the Court to deceive the Supreme Court. They did deceive the Supreme Court.

98.     The State Bar defendants knew that Count 1 was false and a sham. Count 1 charged Fine with "moral turpitude" for filing "frivolous" CCP § 170.3 objections against Mitchell in the *De Flores* case after the final judgment was entered. The State Bar defendants knew that Mitchell was not a judicial officer in the *De Flores* case after the final judgment was entered, therefore the basis of the Count (that he was a judicial officer) was false. The State Bar defendants knew that the California appellate case of *Fine v. Superior Court,* which had referred to nine challenges as frivolous, was voided and annulled when Mitchell, acting as the LA Superior Court, voided and annulled the underlying contempt proceedings on August 21, 2002, along with the claim that he was a "temporary judge" in the *De Flores* case. They knew the Mitchell had defrauded the Court by claiming to be a "temporary judge" in the *De Flores* case in 2003, but such effort failed when Judge Czuleger did not respond to a CCP § 170.3 objection. (See State Bar joint trial exhibit 180). They knew that Mitchell's responses to the

CCP § 170.3 objections were unlawful as they were a "striking or in the alternative answer", which is neither a striking nor an answer.  They knew such was void under law.

99.    The State Bar defendants, as officers of the Court, deceived the Supreme Court.  The Supreme Court was deceived.

100.    The State Bar defendants knew that Count 5 was false and a sham. Count 5 charged Fine with "moral turpitude" for filing an appeal after a status conference in the *De Flores* case before Mitchell.  Here, again, the State Bar defendants knew that Mitchell was not the "temporary judge" in the *De Flores* case.  They also knew from reading the documents in the appeal that the status conference order which was being appealed did not "re-litigate" an earlier removal of Fine as "class counsel" for the settlement class.  They knew from the stipulation of settlement and final judgment that there was not any "class counsel", thus none could be removed.  They knew that Mitchell later stated that any lawyer that represented an individual class member was a "class counsel". They knew that this is a different definition from "class counsel" for a certified class and different from trying to remove Fine from representing a certified class. They knew that Mitchell was trying to change the substance of a final judgment. This is unlawful and prohibited by CCP § 473d.

101.   The State Bar defendants, as officers of the Court, deceived the Supreme Court.   The Supreme Court was deceived.

102.   Count 6 was false and a sham.   Count 6 charged Fine with "moral turpitude" for filing a second CCP § 170.3 objection against Mitchell in 2000 in the *Shinkle* case.   The State Bar defendants argued that the case had been transferred to Judge Horowitz after Mitchell had denied class certification.   They ignored the fact that Mitchell did not deny that he still was a "temporary judge" for class purposes.   Additionally, Mitchell's denial of class certification on substantive grounds was subject to the California Supreme Court case of *Linder v. Thrifty Oil*, 23 Cal.4th 429 (2000), which was decided while the *Shinkle* case was still in the trial court.   This was *stare decisis* on the *Shinkle* case and emasculated Mitchell's order, sending the case back to him for the class certification issue.   He was thus temporary judge as he acknowledged, and subject to the CCP § 170.3 objection.

103.   The State Bar defendants, as officers of the Court, deceived the Supreme Court.   The Supreme Court was deceived.   The State Bar defendants knew that Counts 8-9 (as one count) were false and a sham.   Counts 8-9 charged Fine with "moral turpitude" for failing to inform the Court of Appeal that the trial judge had illegally changed a judgment after a writ had been filed by Fine, changing the substantive language of the judgment.   The State Bar defendants

knew that a judge is prohibited from changing the substance of a final judgment under CCP § 473d.  They also knew that, under CCP § 916, after an appeal is filed or writ is filed in a case, appealing CCP § 170.3 determinations, the trial court loses jurisdiction to make changes.  Here, the change was made after the petition for writ of mandate was filed.

104.    The State Bar defendants, as officers of the Court, deceived the Supreme Court. The Supreme Court was deceived.

105.    The State Bar defendants knew that Count 14 was false and a sham. Count 14 charges Fine with "moral turpitude" for filing "frivolous" CCP § 170.3 objections against Mitchell in the *Debbs*, *Crutchfield*, *McCormick* and *PSO* cases from December 1999 to May 2001.  No Court of record held any of the CCP § 170.3 objections to be "frivolous."   Once again, Mitchell filed an unlawful response of "striking or in the alternate answer" which was legally void.  Mitchell was therefore disqualified under CCP § 170.3(c)(4).   State Bar defendants knew this, and knew that they had a false and sham count.

106.    The State Bar defendants, as officers of the Court, deceived the Supreme Court. The Supreme Court was deceived.

107.    The State Bar defendants knew that every act committed before February 6, 2001 was beyond the five-year statute of limitations.  The NDC was filed on February 6, 2006.  The statute of limitations is five years.  The State Bar

does not fall into the exemption of the NDC having been a State Bar investigation, as it is now known that Mitchell was the "complaining party." No count in the NDC alleged a "continuing concert of action." The statute of limitations, irrespective of the falsity of the counts, eliminates all CCP § 170.3 objections in Counts 1 and 14 (which may leave one or two in each count), all of Count 5, all of Count 6, all of Count 8-9 and all of reinstated Count 4.

108.   The State Bar defendants, acting as officers of the Court, deceived the Supreme Court. The Supreme Court was deceived.

109.   Count 16 was false and a sham. Count 16 charged Fine with "moral turpitude" for filing a motion for leave to file a first amended complaint in the *Lewin* case and substitute the proposed complaint in the *Silva* case. The State Bar defendants knew that the case of *Chang v. Chen*, 80 F.3d 1293 (9th Cir. 1996) sets forth the U.S. Supreme Court and Ninth Circuit policies to allow an amendment to a complaint. Further, the amended complaint cured the problem perceived in the *Lewin* case as it followed the directions of the Court.

110.   The State Bar defendants, as officers of the Court, deceived the Supreme Court. The Supreme Court was deceived.

111.   Count 18 was false and a sham. Count 18 charged Fine with "moral turpitude" for filing a "frivolous" federal complaint; i.e., the *Silva* case. The *Silva* case alleged that the LA County payments to the LA Superior Court judges

violated Article VI, Section 19, of the California Constitution and the First and Fourteenth Amendments of the U.S. Constitution.   The State Bar defendants knew that *Sturgeon*, supra, held that the LA County payments to the LA Superior Court judges violated Article VI, Section 19, of the California Constitution before the Review Department decision became final.   They also knew that Senate Bill SBX2-11 giving retroactive immunity to the judges was enacted before the Supreme Court decision became final.   At all times they knew that no law passed by the legislature "prescribed" the payments.

112.   The State Bar defendants, as officers of the Court, deceived the Supreme Court.  The Supreme Court was deceived.

113.   Counts 20-22 (as one count) was false and a sham.   Counts 20-22 charged Fine with "moral turpitude" for filing a "frivolous" action, the *Mitchell* case.   The Review Department characterized the *Mitchell* case as pursuing the "same claims as in the *Lewin* and *Silva* matters."   In the *Mitchell* case, Fine sought various orders based upon Mitchell having committed a fraud upon the Court by claiming to be temporary judge n the *De Flores* case when he was not. The State Bar defendants knew of the fraud upon the Court by Mitchell, they knew that fraud upon the Court is an exception to the *Rooker–Feldman Doctrine*, they knew that the *Mitchell* case was dealing with no administrative actions as distinguished from judicial decisions in some parts, they knew that the *Mitchell*

case was dealing with current acts which were outside of *Rooker–Feldman* (see *Exxon Mobile Corp. v. Saudi Basic Unc. Corp.*, 544 U.S. 280 (2005), seeking to enjoin unlawful proceedings relating to contempt proceedings against Fine). In *Fine v. Czuleger, et al*, USDC case no. CV-04-0078, the Court held that the claims were identical to those in the *Mitchell* case and stated that the *Mitchell* case should be amended. *Fine v. Czuleger* was a civil rights "habeas corpus" proceeding, brought after incarceration. In the *Mitchell* case, the Court held that it had jurisdiction over habeas proceedings. The State Bar defendants knew all of these facts.

114.   The State Bar defendants, as officers of the Court, deceived the Court.   The Court was deceived.

115.   The State Bar defendants knew that no act allowed in Counts 1, 5, 6, 8-9 and 20-22 was "moral turpitude."   The State Bar defendants knew that the standard for moral turpitude was an act "contrary to honesty and morals." (See *Kitsis v. State Bar*, 23 Cal.3d 857, 865 (1979).)   The State Bar defendants knew that no act in any of the aforementioned counts violated "honesty and good morals."   The State Bar defendants knew that no court of record had sanctioned Fine for any act alleged in the aforementioned counts, with such action not being voided.   The State Bar defendants knew that none of the acts in the aforementioned counts were held to be "frivolous" by any court of record.   In

this regard, the State Bar defendants knew that the State appellate case of *Fine v. Superior Court* was void under U.S. Supreme Court precedent, which California judges are bound to follow.   (See Article 6, Cl. 2 of the U.S. Constitution and the oath of office.)   The State Bar defendants knew that Judge Czuleger's 2003 judgment of contempt was void due to Mitchell's fraud on the court and Czuleger's disqualification under CCP § 170.3(c)(4).   The State Bar defendants knew that the State Bar Court is not a court of record in the California Constitution, and any published opinion rendered by such a court is not law.

116.   The State Bar defendants, as officers of the Court, deceived the Supreme Court.  The Supreme Court was deceived.

117.   The effect of the deception upon the Supreme Court was that the Supreme Court denied Fine's Petition for Review on the Hearing Department's Order of Involuntary Inactive Enrollment, nor does such occur under law when a petition for review is denied, and the Supreme Court denied Fine's Petition for Review of the Review Department's Recommendation of Disbarment. This Recommendation of Disbarment became the order of the Supreme Court under B&P code § 6084 when the denial of review became effective on March 25, 2009.

~~118.   The State Bar defendants publicized the Hearing Department's Order~~ of Involuntary Inactive Enrollment without showing that it was not affirmed by the Supreme Court.

119.   The State Bar defendants published the Review Department Opinion and Recommendation, and list Fine as "disbarred" on the State Bar website.

## Prayer

Wherefore plaintiff prays:

1.     The Court issue an order voiding and annulling the October 12, 2007 decision of the State Bar Court Hearing Department and Order of Involuntary Inactive Enrollment;

2.     The Court order the State Bar to remove the October 12, 2007 Decision and Order of Involuntary Inactive Enrollment from its website and records, and inform all persons and entities whom they had informed of such decision, and order that such decision and order has been ordered to be voided and annulled by the Court;

3.     The Court order the California Supreme Court to void and annul the disbarment of Richard Isaac Fine and to restore his name as an active member of the Bar as if no disbarment had occurred, without the payment of any back dues,

assessments or penalties, and to remove any costs, penalties or other charges levied against him by the Supreme Court or the State Bar;

4.     The Court order the State Bar to remove the Review Department Opinion from its website, restore Richard Isaac Fine to the active list of State Bar members as of October 12, 2007, pay all costs of the State Bar proceeding including transcript costs, copying costs and Supreme Court filing fees to Fine, and to contact all persons and entities whom they informed of the disbarment and inform them that the disbarment has been voided and annulled by this Court;

5.     For costs of suit herein;

6.     For reasonable attorney's fees; and

7.     For such further relief as the Court deems fit.


Dated: January 5, 2010                    Respectfully submitted,



                                  BY: _____
                                       RICHARD I. FINE,
                                       In Pro Per

## Verification

I, Richard I. Fine, declare:

I am the plaintiff herein.  I have read the above complaint and know the facts alleged therein to be true to my personal knowledge.

I declare under penalty of perjury under the laws of the United States of America.

Executed this 5th day of January, 2010, at Los Angeles, California.


BY:   _____
RICHARD I. FINE,
In Pro Per


## Demand For Jury Trial

Plaintiff hereby demands a trial by jury.


Dated:  January 5, 2010                 Respectfully submitted,


BY:   _____
RICHARD I. FINE,
In Pro Per



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**WESTERN DIVISION**
312 North Spring Street, Room G-8  Los
Angeles, CA  90012
Tel: (213) 894-7984

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

**TERRY NAFISI**

District Court Executive
and Clerk of Court

Tuesday, January 05, 2010

RICHARD I. FINE
1824367
441 BAUCHET STREET
LOS ANGELES, CA 90012

Dear Sir/Madam:

A Complaint for Civil Rights was filed today on your behalf and assigned civil case number
CV10- 48 JFW (CW)

A ⎯ Motion for Extension of Time to File Habeas Corpus Petition was filed today on your behalf and
assigned civil case number _____

Please refer to this case number in all future communications.

Please Address all correspondence to the attention of the Courtroom Deputy for:

⎯ District Court Judge _____
X  Magistrate Judge     **Carla Woehrle** _____
at the following address:

**X**  U.S. District Court          Ronald Reagan Federal          U.S. District Court
    312 N. Spring Street       Building and U.S. Courthouse    3470 Twelfth Street
    Civil Section, Room G-8    411 West Fourth St., Suite 1053  Room 134
    Los Angeles, CA  90012     Santa Ana, CA  92701-4516       Riverside, CA 92501

The Court must be notified within fifteen (15) days of any address change.  If mail directed to your
address of record is returned undelivered by the Post Office, and if the Court and opposing counsel
are not notified in writing within fifteen (15) days thereafter of your current address, the Court may
dismiss the case with or without prejudice for want of prosecution.

                                    Sincerely,

                                    Clerk, U.S. District Court


                    By:   ___AGRAGERA_____
                          Deputy Clerk

CV-19 (04/01)              **LETTER re FILING CIVIL RIGHTS COMPLAINT**

Name & Address:

RICHARD I. FINE
PRISONER ID# 1824367
C/O MENS CENTRAL JAIL
441 BAUCHET STREET
LOS ANGELES, CA 90012

FOR OFFICE USE ONLY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

RICHARD I. FINE

PLAINTIFF(S)

V.

STATE BAR OF CALIFORNIA; BOARD OF GOVERNORS OF
THE STATE BAR OF CALIFORNIA; SCOTT DREXEL,
CHIEF TRIAL COUNSEL OF THE STATE BAR OF
CALIFORNIA; AND THE SUPREME COURT OF CALIFORNIA
(ONLY AS A NECESSARY PARTY);

DEFENDANT(S).

CASE NUMBER

CV10-00048 JFW (CW)

**SUMMONS**

TO:    DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within ‾21‾ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, *RICHARD I. FINE 1824367*, whose address is
*441 BAUCHET STREET C/O MENS CENTRAL JAIL*. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated: JAN 5, 2010                     By: _AMY RAGERA_

FOR OFFICE USE ONLY

Deputy Clerk

*(Seal of the Court)*

SEAL

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed
60 days by Rule 12(a)(3)].*